IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEVIN ERNST, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 15-380-RGA |
| | : |
| CAROLYN COLVIN, Acting | : |
| Commissioner of Social Security | : |
| | : |
| Defendant. | : |

## **MEMORANDUM OPINION**

_____

Kevin Ernst, Millsboro, Delaware; Pro Se Plaintiff.

Nora Koch, Acting Regional Chief Counsel Social Security Administration, Office of the General Counsel, Philadelphia, Pennsylvania; Charles M. Oberly, III, United States Attorney for the District of Delaware, Wilmington, Delaware; Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel, Philadelphia, Pennsylvania, Attorneys for Defendant.

October      , 2016
Wilmington, Delaware

*Richard G. Andrews*
**ANDREWS, U.S. District Judge:**

Plaintiff, Kevin Ernst, who appears *pro se*, appeals the decision of Defendant

Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"),

denying his application for disability insurance benefits ("DIB") under Title II of the

Social Security Act (the "Act"), 42 U.S.C. §§ 401-434. The Court has jurisdiction

pursuant to 42 U.S.C. § 405(g). Presently pending before the Court are cross-motions

for summary judgment filed by Ernst and the Commissioner as well as Ernst's motion to

strike.[1] (D.I. 14, 18). Briefing is complete.

## I.   BACKGROUND

### A.   Procedural History

Ernst protectively applied for DIB on January 28, 2011, alleging disability as of

September 2, 2010. (D.I. 10-5 at 82-84). Ernst's application was initially denied on

October 3, 2011 (D.I. 10-4 at 3-8), and upon reconsideration on February 28, 2012. (*Id.*

at 10-15). Hearings took place before an Administrative Law Judge (the "ALJ") on May

17, 2013 and October 13, 2013. (D.I. 10-2 at 56-71, 73-106). At both hearings,

testimony was provided by Ernst and a vocational expert ("VE"). The ALJ issued a

decision on November 12, 2013, finding that Ernst was not disabled. (*Id.* at 36-55).

Ernst sought review by the Appeals Council and submitted additional records, but his

request for review was denied on March 18, 2015, making the ALJ's decision the final

decision of the Commissioner. (*Id.* at 2-31). On May 12, 2015, Ernst filed the current

action for review of the final decision. (D.I. 2).

---

[1]Ernest filed one document that consists of his motion for summary judgment, supporting brief, and the motion to strike. (*See* D.I. 14).

## B.    Plaintiff's Testimony

Ernst was 51 years old when he testified at the May 2013 hearing. (D.I. 10-2 at

79). He is a high school graduate and has past relevant work experience as a tractor

trailer driver. (*Id*. at 80). Ernst testified that he applied for DIB due to shoulder

problems. (*Id*. at 82). At the time of the May hearing, Ernst testified that he was not

receiving treatment for his shoulder, and his most limiting problem was a lesion on his

spinal cord. (*Id*. at 82, 86). Ernst did not receive any treatment for the spinal lesion

prior to February 2011. (*Id*. at 82). Ernst testified that the lesion causes neuropathy,

including pain in the legs and feet, and balance issues, as well as problems with his

hands he described as "fumble fingers." (*Id*. at 84). His physician monitors the lesion

every six months, but surgery, including back surgery, has not been recommended. (*Id*.

at 83-84, 89).

Ernst has pain in his legs and feet, sometimes has neck pain, and has

continuous shoulder pain. (*Id*. at 84-86). He receives chiropractic treatment for range

of motion problems with his neck. (*Id*. at 85). During the May 2013 hearing, Ernst

testified that he took Lyrica[2] three times a day, Nortriptlyine[3] once a day, Tramadol[4]

---

[2]Lyrica is indicated to treat fibromyalgia, diabetic nerve pain, spinal cord injury
nerve pain, and pain after shingles. *See* http://www.lyrica.com/ (Aug. 25, 2016).

[3]Used to treat chronic neuropathic pain. *See* http://www.ncbi.nlm.nih.gov/
pubmed/25569864 (Aug. 25, 2016).

[4]Used to help relieve moderate to moderately severe pain. *See* http://www.
webmd.com/drugs/2/drug-4398-872/tramadol-oral/tramadol-extended-release---oral/det
ails (Aug. 25, 2016).

2

three times a day, and had just started on a Fentanyl patch[5] for pain. (*Id*. at 84-85). At the October 2013 hearing, Ernst testified that the Fentanyl patch dose had been increased, and he had been prescribed another medication for depression and for nerve pain. (*Id*. at 61). With pain medication, Ernst rates his pain at three or four on a scale of one to ten. (*Id*.)

At the end of the May 2013 hearing, the ALJ advised Ernst that she was sending him for a consultative evaluation. (*Id*. at 102-04). At the October 2013 hearing, Ernst testified that he could sit and stand in 20 to 30 minute intervals and walk 200 to 300 feet before having pain or discomfort. (*Id*. at 61-62).

## C. Plaintiff's Medical History, Condition, and Treatment

Ernst sustained an injury at work in 2008 lifting a heavy pallet, followed by three right shoulder surgeries. (D.I. 10-7 at 44). In February 2008, Charles Episalla, M.D., performed right shoulder diagnostic and operative arthroscopy for right shoulder impingement and bursitis. (D.I. 10-5 at 63-64). Following Ernst's return to work, he again complained of shoulder pain with heavy lifting. (D.I. 10-7 at 31). Ernst presented to Christopher Inzerillo, M.D., who performed right shoulder arthroscopic surgery with subacromial decompression for a possibly unrecognized biceps injury in April 2009. (D.I. 10-7 at 26-27, 31-32, 34, 44-45). Ernst continued with complaints of pain and, in December 2010, Stephen Fealy, M.D. performed a diagnostic arthroscopy that revealed right shoulder inter-tubercular groove osteophyte with biceps degeneration within the groove. (*Id*. at 70-77). During a January 2011 follow-up, Ernst complained of issues

---

[5] Used to help relieve severe ongoing pain. *See* http://www.webmd.com/drugs/2/drug-6253/fentanyl-transdermal/details (Aug. 25, 2016).

3

with pain management. (*Id.* at 83). Dr. Fealy opined that Ernst could not return to manual structural labor such as driving a truck or carrying or lifting his body weight up a truck ladder and recommended vocational training that avoided too much physical work. (*Id.*). Dr. Fealy's medical notes state that, from a structural standpoint, Ernst's shoulder was "okay" with no ganglion cyst or tear. (*Id.* at 84). Also, Ernst relayed that he no longer had numbness and tingling in his right hand. (D.I. 10-8 at 13, 21).

In February 2011, Ernst presented to Jeffrey Hawtof, M.D., after CT scans of his cervical spine suggested a lesion at C2-C3 with an increased T2 signal. (D.I. 10-7 at 94, 96, 99-100). Ernst was seen by Jerome Posner, M.D., in May 2011 for a neurosurgical consultation. (D.I. 10-8 at 21-24). Ernst complained of calf and foot pain as of February or March 2011, particularly when he walked, and indicated that he was slightly unsteady on his feet. (*Id.* at 21). The neurological exam was unremarkable except for mild hearing loss. (*Id.* at 22-23). Ernst's gait seemed limited by discomfort, and not weakness or imbalance, and he had full range of motion of his neck, back, hips, and knees. (*Id.* at 22-25). An MRI continued to show an area of hyper-intensity in the upper spinal cord area, but an MRI of the brain was normal. (*Id.* at 4, 9, 23). Dr. Posner concluded that Ernst was presently asymptomatic, and the cause of signal hyper-intensity unknown. (*Id.* at 23). Dr. Posner reported in July 2011 that there were no clear-cut symptoms of myelopathy, and a subsequent work up for a demyelinating disease was negative. (*Id.* at 13, 20). Ernst's cerebrospinal fluid study suggested he had an active inflammatory process, but its cause was unclear and the spinal fluid was

4

not diagnostic. (*Id*. at 13, 18). A repeat MRI showed the lesion was essentially unchanged. (*Id*. at 11, 15, 46-47).

Andrew Brown, M.D., evaluated Ernst in September 2011. (*Id*. at 91-96). The neurological exam was within normal limits, and gait, heel and toe walking were normal. (*Id*. at 92-93). Dr. Brown determined that Ernst was unable to return to his prior work, and he recommended Ernst proceed with re-training. (*Id*. at 97).

In September 2011, Aaron Green, M.D., conducted a consultative evaluation of Ernst. (D.I. 10-8 at 78-81, 83-89). During the examination, Ernst was able to get on and off the exam table, lie supine, sit up and lie supine, and sit up on multiple occasions. (*Id*. at 79). His gait was somewhat ataxic, and he appeared to favor his left leg, but he did not need an assistive device. (*Id*. at 80-81). Range of motion was somewhat diminished in the right shoulder and lumbar region, the remaining range of motion was intact in his cervical spine and upper and lower extremities, and Ernst had good bulk and tone. (*Id*. at 80, 88-89). Dr. Green concluded that Ernst did not appear to have a systemic condition. (*Id*. at 80). Dr. Green opined that Ernst could lift up to 30 pounds, but was not a good candidate for overhead work, and could sit 7 to 8 hours with breaks to stand or stretch. (*Id*. at 81). Darrin Campo, M.D., and Anne Aldridge, M.D., physician consultants who worked with the state agency, reviewed Ernst's file in September 2011 and February 2012, respectively, and opined that Ernst could perform a wide range of light work. (D.I. 10-3 at 10-12, 25-26).

Between November 2011 and April 2012, Ernst underwent a series of neurological evaluations by Lawrence Kemp, M.D., for possible transverse myelitis.

5

(D.I. 10-8 at 102-111; D.I. 10-9 at 69). A brain MRI showed no evidence of white matter disease, a paraneoplastic panel was negative, and a PET scan was negative for evidence of malignancy. (D.I. 10-8 at105, 108, 111). Ernst's neurological exams were unremarkable, and the range of motion of his shoulder was improved. (*Id*. at 102-103, 105-106, 108-109, 112). Dr. Kemp found that medication was helpful in relieving pain. (D.I. 10-8 at 108).

Dr. Kemp's progress notes refer to an evaluation of Ernst by Scott Newsome, D.O., at John Hopkins Medicine's transverse myelitis clinic. (D.I. 10-8 at 111-112). Dr. Kemp reported that Dr. Newsome had found that Ernst's spinal cord lesion was of unclear etiology, and that Dr. Newsome suspected it was due to a transverse myelitis episode although it was atypical for inflammatory myelitis. (*Id*. at 111).

Ernst was seen by Dr. Newsome in June 2012 and December 2012 for routine follow-up. (D.I. 10-9 at 10-12, 14-17, 78-89). Dr. Newsome reported that Ernst's serological studies were unremarkable except for low-normal levels of Vitamin D. (*Id*. at 79, 86). Neuraxial imaging did not demonstrate any significant change in Ernst's spinal cord lesion. (D.I. 10-8 at 141-143; D.I. 10-9 at 2-21, 24-25, 79-80, 86). Testing indicated multilevel degenerative disc disease in the cervical and upper thoracic spines, and a normal brain MRI. (D.I. 10-9 at 79). Ernst's PET/CT scan was negative for signs for malignancy or a systemic inflammatory process, and there was no evidence of FDG[6] uptake at the level of the cervical lesion. (*Id*.). In June 2012, Ernst felt stable overall

---

[6]FDG is a radiopharmaceutical used in medical imaging modality positron emission tomography. *See* https://en.wikipedia.org/wiki/Fludeoxyglucose_(18F) (Aug. 28, 2016).

6

without specific neurologic decline. (*Id.* at 80). Plaintiff completed physical therapy, and he was discharged after reaching maximum potential. (*Id.*) Ernst continued with pain medication for shoulder discomfort and neuropathic pain. (*Id.* at 80-82). Dr. Newsome concluded that Ernst was stable from a neurological perspective, but that Ernst complained of a fair amount of neuropathic discomfort that impeded his quality of life, although his neuraxial imaging was stable. (*Id.* at 82, 88). Dr. Newsome recommended adjusting Ernst's medication regimen and that he continue to engage in an exercise program. (*Id.* at 83, 87).

Ernst was evaluated in March 2013, by Muhammad Arif, M.D., Tunnell Cancer Center, for evaluation after monoclonal proteinemia was found incidentally in Ernst's serological studies. (*Id.* at 33, 34). Dr. Arif found no proteins in Ernst's urine or evidence of any end organ damage. (*Id.* at 34). Dr. Arif opined that Ernst's protein levels were so low that it was unlikely that he had Waldenstrom's macroglobulinemia, which is known to cause neurological complications. (*Id.*). Ernst was also seen by Dr. Newsome in March 2013 for routine follow-up. (*Id.* at 90-94). Ernst relayed that he had attended physical therapy in January, but he felt that it did not help. (*Id.* at 23, 26-28, 90). He also reported that Tramadol helped take the edge off of his pain discomfort. (*Id.* at 91). Dr. Newsome found Ernst's neurological exam was relatively stable, other than increased pain. (*Id.* at 91-92).

On May 31, 2013, B. S. Venkataramana, M.D., performed a consultative evaluation of Ernst at the direction of the ALJ. (*Id.* at 40-55). Ernst walked with a slight unsteadiness, his tandem walk was unsteady, and he was able to do stationary running.

7

(Id. at 48-49). Ernst's motor strength was normal, with no atrophy, and normal tone. (Id. at 49). Sensory test was normal for touch, pin, joint, and vibration, deep tendon reflexes were hyperactive, finger-nose, knee-heel, and alternate movement testing were well-performed. (Id.). Range of motion in the right shoulder was limited, with the remaining range of motion unremarkable. (Id. at 41-44, 49). Dr. Venkataramana noted a history of a rotator cuff tear with residual pain and limitation of right shoulder movement, mild balancing problems, and possible neuropathic pain in his feet due to a spinal cord lesion. (Id. at 49). He opined that Ernst could perform a wide range of light work that involved six hours sitting, two hours standing, and one hour walking; no overhead reaching with his right hand; and no climbing ladders or scaffolds, crouching, crawling or balancing. (Id. at 51-55). At the time of the evaluation, Ernst did not require the use of a cane to ambulate. (Id. at 52). Dr. Venkataramana noted that Ernst is able to shop, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, and sort, handle, and use papers/files. (Id. at 55).

## D. Vocational Expert's Testimony

A VE testified at both hearings. (D.I. 10-2 at 63-70, 97-101). At the May 2013 hearing, the VE identified work that could be done in response to a hypothetical question about an individual who had Ernst's vocational profile and the following limitations:

[(1) could lift at the sedentary level on his dominant side and at the light level on his non-dominant left side; (2) should avoid pushing/pulling with his right arm; (3) could frequently balance, stoop, and climb ramps and stairs, and occasionally crouch and kneel; (4) could not climb a ladder, rope, or scaffold; (5) could do not do overhead work with either arm;

8

(6) could handle and finger frequently with his dominant right hand and constantly with his left hand; and (7) should avoid concentrated exposure to vibration, moderate exposure to background noise, and all exposure to hazards (*i.e.*, heights and moving machinery)].

(*Id.* at 98-99). At the October 2013 hearing, the VE was asked to assume that the same hypothetical individual had additional limitations that he is restricted to work with a sit/stand option where he sat for six hours, stood for two hours, and walked for one hour, consistent with Dr. Venkataramana's opinion. (D.I. 10-2 at 65-66; D.I. 10-9 at 52). The VE opined that the individual could perform light work as a cashier and non-typing office worker. (D.I. 10-2 at 68).

## E.    The ALJ's Decision

The ALJ found that Ernst met the insured status requirements of the Act through December 31, 2015, and that he had not engaged in substantial gainful activity since September 2, 2010, the alleged onset date. (*Id.* at 38).

The ALJ found that Ernst had the following severe impairments: right shoulder injury, status post-multiple surgical procedures, hearing loss, cervical spine lesion, and lumbar degenerative joint disease. (*Id.*). Plaintiff's impairments did not meet or equal the criteria of any of the impairments in the Listing of Impairments. (*Id.* at 39). The ALJ found that Ernst had

the residual functional capacity ["RFC"] to perform light work,[7] except

---

[7]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are

9

bifurcated when lifting individually with dominant right would be at a sedentary level[8] and, when lifting individually with the left would be at a light exertional level, generally avoid pushing/pulling with right arm, posturally frequently balance, stoop, climb ramps and stairs, only occasionally crouch, kneel, no climbing ladder, rope, or scaffold, additionally no overhead work with either arm, handling fingering frequently with right dominant hand but constant on the left with no limitations, and environmentally avoid concentrated exposure to vibrations, avoid all exposure to hazards, which are heights and moving machinery, and avoid even moderate exposure to background noise, sit 6 hours in an eight hour work day, walk one hour in an eight hour work day, and stand two hours in an eight hour work day, with a sit or stand option allowing change of positions during the work day.

(*Id.* at 43) (footnotes added). The ALJ found that Ernst was unable to perform any of

his past relevant work but, based on the VE's testimony, Ernst was capable of making a

vocational adjustment to the performance of a significant number of jobs in the national

economy and, therefore, was not disabled. (*Id.* at 48-49).

## II.  LEGAL STANDARD

### A.  Standard of Review

This Court must uphold the Commissioner's factual decisions if they are

supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Monsour Med. Ctr. v.*

*Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a

preponderance of the evidence but more than a mere scintilla of evidence." *See*

---

additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

[8]The Social Security Regulations define sedentary work as follows: "Sedentary-work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

*Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). "[S]ubstantial evidence (does

not mean a large or significant amount of evidence, but rather such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Pierce v.

Underwood*, 487 U.S. 552, 565 (1988) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305

U.S. 197, 229 (1938)).

In determining whether substantial evidence supports the Commissioner's

findings, the Court may not undertake a *de novo* review of the Commissioner's decision

and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The

Court's review is limited to the evidence that was actually presented to the ALJ. *See

Matthews v, Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2011). "Credibility determinations are

the province of the ALJ and only should be disturbed on review if not supported by

substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. 2001)

(citations omitted). Even if the reviewing Court would have decided the case differently,

it must give deference to the ALJ and affirm the Commissioner's decision if it is

supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## B.    Disability Determination Process

Title II of the Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of

insurance benefits to persons who have contributed to the program and who suffer from

a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). To

qualify for DIB, the claimant must establish that he or she was disabled prior to the date

he or she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240,

244 (3d Cir. 1990). A "disability" is defined as the inability to engage in any substantial

11

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(l)(A). A claimant is disabled "only if [the individual's] physical or mental impairment or impairments are of such severity" that the individual is precluded from performing previous work or "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

To determine whether an individual is disabled, the Commissioner must employ a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in substantial gainful activity, the claimant is not disabled. *Id.* If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is not suffering from a severe impairment or a combination of impairments that is severe, the claimant is not disabled. *Id.*

If the claimant's impairments are severe, step three requires the Commissioner to compare the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(a)(4)(iii);

12

*Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listings, the claimant is presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments or impairment combination are not listed or medically equivalent to any listing, then the analysis continues to steps four and five. 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Commissioner of Soc. Sec. Admin.*, 220 F.3d 112, 131 (3d Cir. 2000)). "The claimant bears the burden of demonstrating an inability to return to [his or] her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is able to return to his or her past relevant work, the claimant is not disabled. *See id.*

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the impairments preclude the claimant from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating "not disabled" finding if claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits.[9] *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other

_____

[9]The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five. *Smith v. Commissioner of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010).

13

jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the Commissioner must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the assistance of a vocational expert is often sought. *See id.*

## III. DISCUSSION

Ernst raises several objections, as follows: (1) inconsistent medical records were used, most notably that in certain instances the record indicates that he had a spinal T2-3 lesion, when he actually has a C2-3 lesion; (2) the ALJ's decision is based upon incorrect opinions of disability determination services personnel; (3) the ALJ improperly afforded little weight to his testimony and the opinions of Dr. Scott Newsome; (4) the ALJ's findings regarding Ernst's restrictions are inconsistent when compared to the medical records; (5) the ALJ did not investigate or evaluate the evidence of record and failed to develop the significance of his severe impairments (longitudinal evidence); and (6) the hypothetical posed to the VE was confusing. (D.I. 14 at 19-25). Conversely, the Commissioner contends that the ALJ carefully considered the entire record, applied the correct law, and relied upon substantial evidence to reach her decision.

### A. C2-C3 vs. T2-T3 Spinal Lesion

Ernst contends that error occurred because the original disability determination services case manager made a mistake that indicated Ernst had a T2-23 spinal lesion, when he actually has a C2-C3 spinal lesion. Ernst contends that, as a result, his complaints of pain do not correlate with his complaints of multiple impairments. The

14

reference to T2-T3 appears to be a typographical error by Dr. Campo (D.I. 10-3 at 12)
that was copied by the ALJ. (D.I. 10-2 at 46). Dr. Campo's report indicates that Ernst's
attorney would be sending Dr. Campo an MRI report from Progressive Radiology for the
year 2011. The record contains two Progressive Radiology MRI reports of Ernst's
cervical spine at the C2-C3 level, one dated March 21, 2011, and the other dated
August 8, 2011, and no Progressive Radiology MRI reports at the T2-T3 level. (See
D.I. 10-8 at 10, 46). It is evident in reading the medical reports that the area at issue,
and upon which medical opinions were based, was C2-C3.[10] In a similar vein, Ernst
contends that the ALJ erred because her opinion is based on the incorrect opinions of
disability determination services personnel. To the extent Ernst refers to the T2-T3 vs.
C2-C3 issue, the assignment of error is without merit and had no effect upon the
decision of the ALJ. Moreover, the final responsibility for determining a claimant's RFC
is reserved to the Commissioner. See Breen v. Commissioner of Soc. Sec., 504 F.
App'x 96 (3d Cir. Nov. 2012) (citing 20 C.F.R §§ 404.1546(c)). The typo in the ALJ's
decision is not a basis to argue a lack of substantial evidence.

## B.      Weight Afforded to Physicians

Ernst contends that the ALJ erred in not adopting the opinion of Dr. Newsome.
He argues this makes no sense because MRI reports are mentioned in every report Dr.
Newsome prepared. (D.I. 14 at 20). The MRI reports, however, are not evidence that
Ernst is unable to work. Rather they are evidence of a spinal cord lesion that, as
demonstrated by the record, is stable. (D.I. 10-2 at 43).

_____

[10] The ALJ mostly referred to this area as "C2-3" or "C2-C3" and not as "T2-T3."
(See D.I. 10-2 at 40, 42).

15

An ALJ is free to choose one medical opinion over another where the ALJ considers all of the evidence and gives some reason for discounting the evidence she rejects. *See Diaz v. Commissioner of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009); *Plummer*, 186 F.3d at 429 ("An ALJ . . . may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."). Opinions of a treating physician are entitled to controlling weight only when they are well-supported and not inconsistent with other substantial evidence in the record. *See Hall v. Commissioner of Soc. Sec.*, 218 F. App'x 212, 215 (3d Cir. 2007) (affirming ALJ's decision to give little weight to treating physician's reports because of "internal inconsistencies in various reports and treatment notes . . . as well as other contradictory medical evidence"); *Fargnoli*, 247 F.3d at 43.

The ALJ detailed her reasons for affording less weight to the opinion of Dr. Newsome. The ALJ noted that Dr. Newsome's opinion was not consistent with the clinical or objective evidence of record, observing that: (1) other medical records did not describe the level of debilitation to such a degree that Ernst is precluded from all work as determined by Dr. Newsome; (2) Dr. Newsome's opinion was not consistent with his own treatment records; (3) Dr. Newsome's treatment records ended in March 2013; and (4) Dr. Newsome's opinions were inconsistent with the other opinions of record from Drs. Green, Brown, and Venkataramana. (D.I. 10-2 at 45).

Further, as will be discussed below, the ALJ cited to the medical evidence of record to support her decision to give little weight to the opinion of Dr. Newsome. Thus, after a careful review of the evidence of record and considering the parties' positions, the Court finds that substantial evidence supports the ALJ's decision to give little weight

16

to the opinion of Dr. Newsome.

## C. Credibility of Plaintiff

Ernst argues the ALJ erred when evaluating the credibility of his subjective
complaints and giving little weight to his statements. The ALJ found that Ernst's
statements concerning the intensity, persistence, and limiting effects of his symptoms
were not entirely credible.

An ALJ must give great weight to a claimant's testimony only "when this
testimony is supported by competent medical evidence," and an ALJ may "reject such
claims if he does not find them credible." *Schaudeck v. Commissioner of Soc. Sec.*,
181 F.3d 429, 433 (3d Cir. 1999). The ALJ "has the right, as the fact finder, to reject
partially, or even entirely, such subjective complaints if they are not fully credible."
*Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974).

Under 20 C.F.R. § 404.1529(c)(3), the kinds of evidence that the ALJ must
consider, in addition to the objective medical evidence, when assessing the credibility of
an individual's statements include: the individual's daily activity; location, duration,
frequency, and intensity of the individual's symptoms; factors precipitating and
aggravating the symptoms; the type, dosage, effectiveness, and side effects of
medication taken to alleviate the symptoms; treatment, other than medication, received
for relief of the symptoms; any non-treatment measures the individual uses to relieve
pain or symptoms; and other factors concerning the individual's functional limitations
and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). In
addition, the ALJ should account for the claimant's statements, appearance, and
demeanor; medical signs and laboratory findings; and physicians' opinions regarding

17

the credibility and severity of plaintiff's subjective complaints. Social Security Ruling 96-7p, 1996 WL 374186 (S.S.A. 1996). The ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p; *see also Schaudeck,* 181 F.3d at 433.

The ALJ discussed in detail her reasons for finding Ernst's statements "not entirely credible." She noted that medical records indicate that Ernst had full range of motion in the back and neck without substantial discomfort and full range of motion in the hips without discomfort, his pain medication reduces his discomfort considerably to a range of 3 to 4 on a scale of one to 10, and he receives chiropractic care which helps. (D.I. 10-2 at 44). Finally, the ALJ did not totally discount Ernst's statements, finding them "not entirely credible" rather than "not credible."

The ALJ articulated reasons to support her negative credibility determination. "[W]here . . . the ALJ has articulated reasons supporting a credibility determination, that determination will be entitled to 'great deference.'" *Horodenski v. Comm'r of Soc. Sec.,* 215 F. App'x 183, 188-89 (3d Cir. 2007). Thus, given this deferential standard, "the Court cannot say there is not substantial evidence to support the ALJ's [credibility] determination." *Mayo v. Astrue,* 2012 WL 3185418 (D. Del. 2012). Therefore, the Court concludes that there is substantial evidence to support the ALJ's finding that Ernst's statements were "not entirely credible."

## D. Development of the Record and the RFC

Ernst argues that the ALJ erred because she did not investigate or evaluate the evidence of record, she failed to develop the significance of his severe impairments, and her findings regarding his restrictions are inconsistent with the medical records. The Commissioner contends that substantial evidence supports the ALJ's finding that Ernst retained the ability to perform a wide range of light work given his credible subjective complaints.

Initially, the Court notes that, contrary to Ernst's position that the ALJ failed to develop the record, the ALJ took affirmative action to fully develop the record. At the end of the May 2013 hearing, the ALJ stated that Ernst should undergo a consultative evaluation, with the completion of an RFC form, because, after she read the reports, she thought the case might be "on the cusp". (D.I. 10-2 at 101-04). As a result, Ernst was neurologically examined by Dr. Venkataramana on May 31, 2013, and a second hearing took place in October 2013 so that the VE could respond to hypotheticals incorporating that evaluation.

In addition, it is clear in reading the ALJ's decision that she thoroughly reviewed Ernst's longitudinal treatment history. (D.I. 10-2 at 46-47). Ernst complained that he could not work because of his history of multiple right shoulder surgeries, but as noted by the ALJ, Ernst testified that he was not seeking shoulder treatment. (D.I. 10-2 at 41, 86). In addition, the ALJ considered that, according to medical records, Ernst no longer had numbness and tingling in his hand and his shoulder was "okay" from a structural standpoint to support her finding that Ernst could perform work that involved restricted use with no overhead work and minimal lifting consistent with the demands of sedentary

19

work with his right upper extremity. (D.I. 10-2 at 40, 43; D.I. 10-7 at 84; D.I. 10-8 at 13, 21).

With regard to Ernst's spinal court lesion, the ALJ considered that MRI reports of the cervical spine revealed no cord compression and only mild degenerative disc disease/degenerative joint disease. (D.I. 10-2 at 42, 44; D.I. 10-7 at 94). The ALJ considered that, in May 2011, Ernst complained of some neck pain and onset of intermittent pain in his calves and feet, particularly when walking, and that he was slightly unsteady on his feet, but that clinically, he demonstrated full range of motion in his neck, back, and hips, his motor functions, sensation, and coordination were normal, his tandem walking and standing were normal, and his brain MRI was normal. (D.I. 10-2 at 44; D.I. 10-8 at 21-23).

In addition, the ALJ considered Ernst's treatment by Dr. Newsome, who found that Ernst had gained mobility in his shoulders and that medication helped with his pain. (D.I. 10-2 at 44, 85). She further considered that Dr. Newsome found that Ernst's brain MRI was normal, his serological studies were unremarkable, neuraxial imaging demonstrated a stable lesion at the dorsal spinal canal, his PET/CT scan did not demonstrate any signs of malignancy or a systemic inflammatory process, and there was no evidence of FDG uptake at the level of the cervical lesion. (D.I. 10-8 at 141-143; D.I. 10- at 24-25, 75, 79-80, 86). She also considered that Dr. Newsome's March 2013 evaluation found that Ernst was relatively stable from a neurological perspective despite his amplification of symptomatology and a relatively new report of extremity vibration sensation. (D.I. 10-2 at 41; D.I. 10-9 at 91-92).

Finally, the ALJ considered the consultative examinations of Drs. Green and

20

Venkataramana, with Dr. Green finding that Ernst was able to get on and off the exam table, lie supine, sit up and lie supine, and sit up on multiple occasions, did not need to use an assistive device though he appeared to favor his left leg, had good bulk and tone, and had somewhat diminished range of motion of his right shoulder and lumbar spine, and Dr. Venkataramana finding that Ernst could do stationary running, had mild balancing problems, had normal motor strength with no atrophy, had normal sensation to touch, pin, joint, and vibration, performed finger-nose, knee-heel, and alternating movements well, and had unremarkable range of motion taking into consideration right shoulder limitation. (D.I. 10-2 at 44-46; D.I. 10-98 at 40-97).

The ALJ found that Ernst's treatment history supported the RFC assessment for light work with a sit/stand option that took into account postural and environmental restrictions. Ernst contends that the ALJ erred based upon Dr. Green's opinion that Ernst would not be a good candidate for working overhead, climbing ladders, or frequent bending. (D.I. 10-2 at 46-47; D.I. 14 at 3). The ALJ's decision demonstrates, however, that she took this into account by limiting Ernst to no overhead work with his arms and no climbing ladders. (D.I. 10-2 at 43). In addition, although the ALJ found that Ernst could frequently bend, she decreased the amount Ernst would have to bend to the floor for lifting/carrying to the demands of sedentary to light work, and not the 30 pounds found by Dr. Green. (*Id.*) Ernst also argues that Dr. Venkataramana reported that he could he could not walk a block at a reasonable pace on rough or uneven surfaces. (D.I. 14 at 3). Ernst, however, fails to consider Dr. Venkataramana's opinion that he could walk for one hour, and that the ALJ adopted this limitation in her RFC. Nor is there evidence of record that the cashier and office worker jobs, identified by the

VE as those Ernst could perform, took place on a rough or uneven surfaces. (D.I. 10-2 at 43, 65-66, 68; D.I. 10-8 at 52).

The ALJ thoroughly analyzed the medical evidence, considered the medical opinions, and appropriately relied upon the testimony of the VE. Accordingly, the Court finds that substantial evidence supports the ALJ's ruling and her evaluation of his RFC.

### E. Hypothetical

Ernst contends that the hypotheticals posed to the VE at the first hearing were confusing. To ascertain the claimant's RFC, the ALJ must pose a hypothetical "accurately convey[ing]" all of the claimant's "credibly established limitations" to an independent vocational expert. *Rutherford*, 399 F.3d at 554.

A review of the transcript indicates that the ALJ properly posed hypothetical questions that incorporated Ernst's credible limitations and, while there may have been some initial confusion, the ALJ clarified the questions posed to the VE. In addition, the ALJ posed hypotheticals to the VE at the second hearing. The VE found that jobs existed in significant numbers in the national economy that Ernst could perform. Accordingly, there is substantial evidence to support the ALJ's conclusion that Ernst was not under a disability from the alleged onset date to the date of the decision.

### F. Motion to Strike

Ernst moves to strike certain portions of the administrative record. (D.I. 14 at 22). The Commissioner opposes. The Act requires that "[a]s part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and

decision complained of are based." 42 U.S.C. § 405(g) (sentence three). The Court's power to affirm, modify, or reverse the Commissioner's decision is based upon a review of the pleadings and the transcript of record. 42 U.S.C. § 405(g) (sentence four). Thus, the Court's power to review the Commissioner's decision is predicated, in part, upon a review of the "evidence upon which the findings and decision complained of are based." 42 U.S.C. § 405(g) (sentence three).

The ALJ based her decision, in part, upon portions of the record that Ernst seeks to strike. Thus, the Court cannot strike portions of the evidence upon which the Commissioner relied in formulating her decision. In addition, case law supports the general premise that "a reviewing court considers the whole record," *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988), and that the Court is limited to reviewing the administrative record that was before the agency and formed the basis for the agency's decision. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

Ernst provides no basis for striking portions of the record. Therefore, the Court will deny Ernst's motion to strike.

## IV. CONCLUSION

For the reasons discussed above, the Court will: (1) deny Ernst's motion to strike (D.I. 14); (2) deny Ernst's motion for summary judgment (D.I. 14); and (3) grant the Commissioner's cross-motion for summary judgment (D.I. 16).

A separate order will be entered.

23